UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ELENA M. RIZZO,

                       Plaintiff,        1:12-CV-1397
                                          (GTS/CFH)

v.

HEALTH RESEARCH, INC.,

                       Defendant.
_____

APPEARANCES:                      OF COUNSEL:

LAW OFFICES OF RONALD J. KIM, P.C.    RONALD J. KIM, ESQ.
  Counsel for Plaintiff
P.O. Box 318
Saratoga Springs, NY 12866

WHITEMAN, OSTERMAN & HANNA, LLP    CHRISTOPHER M. McDONALD, ESQ.
  Counsel for Defendant                 HEATHER D. DIDDEL, ESQ.
One Commerce Plaza, Suite 1900        ROBERT S. ROSBOROUGH, IV, ESQ.
Albany, NY 12260

GLENN T. SUDDABY, Chief United States District Judge

## <u>DECISION and ORDER</u>

Currently before the Court, in this employment discrimination action filed by Elena Rizzo ("Plaintiff") against Health Research, Inc. ("HRI" or "Defendant"), are Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 38) and Plaintiff's cross-motion to strike certain affidavits and exhibits filed in support of Defendant's motion, pursuant to Fed. R. Civ. P. 37 (Dkt. No. 58.)  For the reasons set forth below, Defendant's motion for summary judgment is granted, and Plaintiff's cross-motion is denied.

# I. RELEVANT BACKGROUND

## A. Plaintiff's Amended Complaint

Plaintiff's Amended Complaint asserts the following five claims: (1) a claim that Plaintiff suffered continued discrimination and retaliation due to her FMLA sanctioned leave that was so severe that she was constructively discharged by Defendant; (2) a claim for retaliatory discharge under the FMLA, 29 U.S.C. § 2615; (3) a claim for interference with Plaintiff's rights under the FMLA, 29 U.S.C. § 2615; (4) a claim for discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA") and the New York State Human Rights Law ("NYSHRL"); and (5) a claim for retaliation on the basis of disability in violation of the ADA and NYSHRL. (Dkt. No. 16, ¶¶ 46-81 [Pl.'s Am. Compl.].)

## B. Defendant's Motion for Summary Judgment

Defendant has moved for summary judgment to dismiss Plaintiff's Amended Complaint in its entirety. (Dkt. No. 38.) In support of its motion, Defendant argues that Plaintiff cannot establish a prima case of retaliation under the FMLA, ADA, and NYSHRL for the following six reasons: (1) Plaintiff was not constructively discharged; (2) Plaintiff was never stripped of any job titles or barred from attending unit manager meetings after she returned from FMLA leave because she requested and was granted a transfer to a new supervisor with different responsibilities; (3) none of HRI's employment actions were materially adverse; (4) none of the allegedly adverse employment actions occurred under circumstances giving rise to an inference of retaliation; (5) legitimate, non-retaliatory reasons existed for all of the allegedly adverse employment actions; and (6) the end of grant funding for Plaintiff's position is not a pretext for retaliation. (Dkt. No. 40, at 6-22 [Def.'s Mem. of Law].)

With respect to Plaintiff's FMLA interference claim, Defendant argues that this claim should be dismissed because HRI did not deny Plaintiff any benefits to which she was entitled by the FMLA. (*Id.* at 22-23.)

Finally, with respect to Plaintiff's ADA and NYSHRL disability discrimination claims, Defendant argues that these claims should be dismissed for the following three reasons: (1) there is no admissible record evidence establishing that Plaintiff requested and was denied an accommodation; (2) Plaintiff has not identified any ways in which she was treated differently from other similarly situated employees; and (3) Plaintiff cannot establish a hostile work environment based on her disability. (*Id.* at 24-25.)

### C. Plaintiff's Cross-Motion to Strike

Plaintiff's cross-motion requests an Order striking the affidavits of the following affiants, filed in support of Defendant's motion for summary judgment: (1) Debra Blog, (2) Bryan Cherry, (3) Kimberly Kilby, (4) Deena Reyes, (5) Michael Saglimbeni, and (6) Shelley Zansky. (Dkt. No. 59, at 1 [Pl.'s Mem. of Law].) In addition, Plaintiff's cross-motion requests an Order striking Exhibits A, I, and K, which were filed as exhibits to the Kuhles Affidavit. (*Id.*) In support of this motion, Plaintiff argues that Defendant never disclosed the identity of these six affiants or three exhibits in response to discovery requests. (*Id.*)

### D. Statement of Material Facts

#### 1. Plaintiff's Failure to Comply with N.D.N.Y. Local Rule 7.1

Before reciting the material facts of this case, the Court must address Plaintiff's response to Defendant's Rule 7.1 Statement of Material Facts. Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires a party moving for summary judgment to submit a statement of

material facts supported by specific citations to the record where those facts are established. N.D.N.Y. L.R. 7.1(a)(3). The non-moving party's subsequent response must mirror the moving party's statement of material facts by (1) admitting and/or denying each of the moving party's factual assertions in matching numbered paragraphs and (2) supporting any denials with specific citations to the record where the factual issues arise. *Id.* Importantly, "[t]he Court shall deem admitted any properly supported facts set forth in the [moving party's] Statement of Material Facts that the [non-moving] party does not specifically controvert." *Id.*

This Court's "Local Rule requirements are not empty formalities." *Bombard v. Gen. Motors Corp.*, 238 F. Supp. 2d 464, 467 (N.D.N.Y. 2002) (Munson, J.) (stating that "[t]he courts of the Northern District have adhered to a strict application of Local Rule 7.1[a][3]'s requirement on summary judgment motions"); *accord*, *Cross v. Potter*, 09-CV-1293, 2013 WL 1149525, at *3 (N.D.N.Y. Mar. 19, 2013) (McAvoy, J.). Indeed, the underlying purpose of this rule "is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment." *Youngblood v. Glasser*, 10-CV-1430, 2012 WL 4051846, at *4 (N.D.N.Y. Aug. 22, 2012) (Peebles, M.J.); *see also N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005) (noting that "Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties'") (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 [2d Cir. 2001]). This purpose is especially important here, where the record on Defendant's motion exceeds 1500 pages in length.

In the present case, Plaintiff has largely failed to respond appropriately to Defendant's Rule 7.1 Statement of Material Facts. Specifically, Plaintiff claims to deny 136 of the 216 paragraphs of HRI's Rule 7.1 Statement. (*See generally* Dkt. No. 57 [Pl.'s Rule 7.1 Response].) Of these 136 denials, 117 denials do not contain a specific citation to the record.[1] Therefore, the facts "denied" by these paragraphs will be deemed admitted. *See Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3]); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's Rule 56.1 statement but declined to provide record citations in support); *N.Y. Teamsters*, 426 F.3d at 648-49 (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations").

With respect to the remaining 19 of these 136 denials, Plaintiff "admits" various of the material facts stated in two of the paragraphs 85 and 96–notwithstanding her inclusion of additional facts or legal argument in those responses. The various facts at issue will therefore be deemed admitted. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true

---

[1]        (Dkt. No. 57, ¶¶ 5-8, 10-18, 22, 24-25, 27-30, 34, 37-57, 60-69, 72-77, 86-88, 91-95, 97-98, 100-03, 105-06, 111-12, 114, 118-19, 121-22, 129, 137-39, 142, 147, 149-150, 156, 158-166, 176, 180, 183-84, 188-193, 196-97, 199-202, 205, 211.)

because Plaintiff[']s initial response in each instance is 'Admit'"); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'"). With regard to 13 of the 17 remaining denials, Plaintiff provides appropriate record citation following the denials; however, the cited evidence does not *support* those denials.[2] Accordingly, the facts asserted in these 13 paragraphs will be deemed admitted. *See Holtz*, 258 F.3d at 73-74 (noting that, "where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion").

The Court further notes that 21 of Plaintiff's 136 denials will be deemed admitted on the additional basis that she makes editorial comments and legal arguments that are non-responsive.[3] *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions

---

[2]     (Dkt. No. 57, ¶¶ 130-33, 135-36, 140-41, 151, 157, 175, 178, 182.)

[3]     (Dkt. No. 57, ¶¶ 85, 96-98, 100-03, 105, 114, 137-39, 161, 166, 176, 178, 197, 199, 201, 205.)

plaintiff has been compelled to make").[4]  Similarly, for 118 of Plaintiff's 136 denials, Plaintiff

asserts that these facts should be disregarded because they rely on inadmissible evidence.[5]  A

denial based upon "inadmissible evidence," without more, is insufficient to object to a material

fact under this Court's Local Rules.  Rather, Fed. R. Civ. P. 56 requires merely that the material

contained in the exhibits "*can* [] *be* presented in a form that *would be* admissible in evidence [at

trial]." Fed. R. Civ. P. 56(c)(2) (emphasis added).  In any event, as discussed below in Point

III.A. of this Decision and Order, the Court finds that the affidavits proffered by Defendant in

support of each statement challenged in this fashion are admissible.

In sum, after carefully reviewing the parties' respective Rule 7.1 Statements, the Court

finds that the material facts contained in Defendant's Statement are supported by the record and

that only the material facts contained in the following four paragraphs have been properly

refuted by Plaintiff: ¶¶ 35, 120, 188-86.

## 2. Undisputed Material Facts

Plaintiff was hired by HRI in 2002 to work at the Bureau of Communicable Disease

Control ("BCDC" or the "Bureau") as a Program Research Specialist II, Grade 18.  (Dkt. No. 39,

¶ 19 [Def.'s Rule 7.1 Statement].)  During the course of her employment, Plaintiff was promoted

twice and, at the time of her layoff, held the position of Associate Program Research Specialist,

---

[4]        *See also Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10
(N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment
procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts).  To the extent
that Plaintiff desired to set forth any additional material facts that she contends are in dispute, she was
required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs (which she did not).

[5]        (Dkt. No. 57, ¶¶ 5-6, 10-18, 22, 25, 27-30, 34-35, 37-57, 60-69, 72-77, 85-88, 91-98,
100-03, 105-06, 111-12, 114, 118-122, 129, 132, 137-140, 142, 147, 149-150, 158-166, 176, 178, 180,
182-86, 188-190, 192-93, 196, 200, 202.)

Grade 25.  (*Id.*, ¶¶ 26, 31.)  Plaintiff's employment with BCDC was terminated on October 31, 2012, when the funding provided by the Center for Disease Control and Prevention ("CDC") for her position ended.  (*Id.*, ¶ 211.)

HRI & BCDC

HRI is a private not-for-profit corporation incorporated in New York State and is a grants administrator.  (*Id.*, ¶¶ 1-2.)  Its mission is primarily to support and enhance the ability of the New York State Department of Health ("DOH") and the Roswell Park Cancer Institute Corporation ("Roswell") in undertaking public health ventures and initiatives.  (*Id.*, ¶ 2.)  DOH is a state agency tasked with, among other things, promoting and supervising public health activities throughout New York State and reducing infectious diseases such as food and waterborne illnesses, hepatitis, HIV, meningitis, sexually transmitted diseases, tuberculosis, and chronic disabling illnesses such as heart disease, cancer, stroke, and respiratory diseases.  (*Id.*, ¶ 10.)  As part of its mission, DOH works with the State's health care community to ensure appropriate readiness and response to potential health threats, including providing emergency triage services to contain and treat infectious diseases.  (*Id.*, ¶ 11.)

The BCDC is a bureau within the DOH for Community Health, Division of Epidemiology.  (*Id.*, ¶ 12.)  Some BCDC programs are funded by competitive grants from the CDC, lasting between three and five years each.  (*Id.*, ¶ 14.)  As noted above, Plaintiff's position was a grant-funded position and she understood that the position could end if grant funding ceased.  (*Id.*, ¶ 20.)  As a Program Research Specialist II, Plaintiff was responsible for surveillance of Hepatitis A, B, and C, which entailed development of detailed reporting protocols, management of databases, evaluation of the quality of data, and assessment of the effectiveness of the surveillance systems.  (*Id.*, ¶ 22.)

<u>Re-structuring of BCDC</u>

During Plaintiff's employment, the BCDC leadership and programs were in a constant state of change. (*Id.*, ¶ 37.) Plaintiff was supervised by four different Bureau directors within a span of ten years while employed by HRI. (*Id.*, ¶ 38.) In late 2008, the BCDC, which contained six programs at the time, was split into three separate bureaus. (*Id.*, ¶ 39.) As a result of this restructuring, the BCDC was left severely understaffed with reduced funding. (*Id.*, ¶¶ 41-42.) In early 2009, Dr. Kimberly Kilby, the new Bureau Director, was tasked with reorganizing BCDC and streamlining operations to respond more efficiently to the CDC's changing grant deliverables. (*Id.*, ¶ 45.) For example, Dr. Kilby created the Data Management Unit to coordinate surveillance of all communicable diseases tracked by BCDC, including the hepatitis surveillance program on which Plaintiff worked. (*Id.*, ¶ 47.) Dr. Bryan Cherry was the director of the Data Management Unit and supervised Plaintiff. (*Id.*, ¶ 48.)

Dr. Kilby also implemented cross-training initiatives, which involved training of epidemiological staff to address public health issues relating to all communicable disease program areas, not merely the area in which they had particular expertise. (*Id.*, ¶ 50.) This included establishing phone coverage rotations called epidemiologist of the day ("EOD") and rabies consultant of the day ("ROD"). (*Id.*, ¶ 51.) Under these rotations, epidemiological staff members, including Plaintiff, were assigned to answer consult calls from labs and local health departments on a rotating weekly basis. (*Id.*) Dr. Kilby and Dr. Cherry asked all epidemiological staff to step out of their comfort zones and contribute in areas that may not have been directly related to the grants on which they were funded because BCDC was so severely understaffed. (*Id.*, ¶ 52.) Accordingly, Plaintiff was asked to spend approximately 10% to 20% of her time assisting with the EOD, ROD, and other matters that were not necessarily related to hepatitis surveillance. (*Id.*, ¶ 53.)

<u>Plaintiff's Dissatisfaction with Non-Hepatitis Related Work</u>

By early 2010, Plaintiff began to express frustration with having to perform non-grant-related work for the Bureau because she felt it was not part of her job.  (*Id.*, ¶¶ 54, 67.)  In June 2010, Plaintiff requested a "temporary reprieve" from non-hepatitis related work so that she could work on the upcoming hepatitis grant renewal.  (*Id.*, ¶ 73.)  Dr. Kilby and Dr. Cherry accommodated Plaintiff's request to the extent that they could and agreed to reduce Plaintiff's rotation on EOD to once every three weeks and agreed to remove her from the ROD rotation altogether.  (*Id.*, ¶ 74.)  However, in an e-mail written by Dr. Cherry on July 13, 2010, Dr. Cherry explained to Plaintiff that the Bureau was too understaffed to permit Plaintiff to work only on hepatitis-related programs.  (*Id.*, ¶ 75.)  He further advised that she was "part of a bureau where everyone is being asked to step out of their usual role in order to maintain cross training" and it was part of her job to perform work for program areas other than hepatitis.  (*Id.*)  Dr. Cherry also assured Plaintiff that her opinions concerning hepatitis surveillance were considered when the Bureau leadership made decisions concerning the hepatitis program, but advised her that the decisions did not rest solely on her input.  (*Id.*, ¶ 76.)  Nonetheless, Dr. Cherry expressed concern that Plaintiff was dissatisfied with her work and that her dissatisfaction was negatively impacting her attitude toward other employees.  (*Id.*, ¶ 77.)

On July 21, 2010, Plaintiff wrote a rebuttal to Dr. Cherry's e-mail of July 13, 2010, for her own records claiming that she felt retaliated against because she "asked for relief of some of [her] non-hepatitis responsibilities."  (*Id.*, ¶ 78.)  Plaintiff also expressed continued frustration with the "management style" of her supervisors and the "change in the office environment over the past several months."  (*Id.*)  Plaintiff did not attribute any of her supervisors' actions to any actual or perceived disability she may have had.  (*Id.*)

<u>Plaintiff's First FMLA Request</u>

Under HRI's FMLA Leave Policy, eligible employees are entitled to up to 12 weeks of leave in a 12-month period for, among other things, a "serious health condition" that makes it impossible to perform essential job functions. (*Id.*, ¶ 79.) The form used by HRI for a FMLA leave request was developed by the Equal Employment Opportunity Commission ("EEOC"). (*Id.*, ¶ 80.) The form does not reveal anything about an employee's health condition, but merely seeks acknowledgment from the employee's supervisor indicating that the supervisor was made aware that the employee is seeking FMLA leave. (*Id.*) HRI's Human Resources Department reviews and finally determines all FMLA requests. (*Id.*, ¶ 82.) HRI's FMLA Leave Policy further provides that an employee returning from approved FMLA leave "will be restored to the same position or to a position with the same benefits, pay, and other terms and conditions of employment." (*Id.*, ¶ 83.) However, the policy also states that "FMLA leave will not extend to a period of appointment beyond the date the employment would otherwise terminate. If the position held by an employee on FMLA leave is terminated while the employee is on leave, the leave will terminate on the date that the position is terminated." (*Id.*, ¶ 84.)

In 2010, Plaintiff was diagnosed with Major Depressive Disorder, a medical condition rendering her intermittently disabled. (*Id.*, ¶ 32.) On the morning of August 4, 2010, Plaintiff requested that Dr. Cherry, as her supervisor, sign the FMLA leave acknowledgment form indicating that she was applying for FMLA leave. (*Id.*, ¶ 85.) Dr. Cherry was unfamiliar with the form and HRI's FMLA leave policy and sought clarification from Lori Hallenbeck, the BCDC office administrator. (*Id.*, ¶ 86.) After being advised that all he had to do was sign the form acknowledging Plaintiff's request, Dr. Cherry did so, and neither he nor Dr. Kilby was involved in Plaintiff's leave determination, which was handled by human resources. (*Id.*, ¶¶ 87-88.)

<u>The Fox Incident</u>

Later on the same day that Plaintiff presented Dr. Cherry with her FMLA form, Plaintiff received a phone call while at work from a wildlife rehabilitator, Wendy Hall, whom she knew outside of work.  (*Id.*, ¶ 89.)  Ms. Hall was distraught regarding the impending euthanasia of a fox in her care as a result of a potential rabies exposure to a child.  (*Id.*)  Plaintiff, who had obtained a wildlife rehabilitation permit from the New York State Department of Environmental Conservation in January 2010, using Dr. Cherry as a character reference, was active in the North Country Wild Care, a local animal rehabilitation organization, as a volunteer wildlife rehabilitator.  (*Id.*, ¶ 90.)  Plaintiff immediately spoke with Dr. Cherry (who was also the New York State Veterinarian at the time) about the situation and relayed the information that Ms. Hall had told her.  (*Id.*, ¶ 91.)  Dr. Cherry advised Plaintiff that, as long as there was no evidence that the child had been bitten, he did not see any need to euthanize the fox.  (*Id.*)  Thereafter, Dr. Cherry spoke with the Saratoga County Local Health Department and received information indicating that the fox did in fact bite the child; Dr. Cherry agreed that the fox should be euthanized and its brain sent for rabies testing.  (*Id.*, ¶ 92.)

Plaintiff confronted Dr. Cherry in the hallway outside of his office and challenged his decision, claiming that Dr. Cherry knew that the fox did not have rabies.  (*Id.*, ¶ 93.)  Plaintiff began crying and criticized Dr. Cherry's decision, calling it "disgusting."  (*Id.*, ¶ 94.)  Plaintiff then returned to her office and continued crying and commenting loudly about the situation. (*Id.*)  Plaintiff's comments and behavior were witnessed by other staff in the office at the time. (*Id.*)

Dr. Cherry spoke with Dr. Kilby about Plaintiff's behavior and they agreed that Plaintiff showed extremely poor judgment and an inability to keep her outside involvement in wildlife rehabilitation from interfering with the performance of her work. (*Id.*, ¶ 95.) Dr. Kilby sought advice in handling the situation from, among others, (1) Ms. Hallenbeck in Human Resources, (2) Marybeth Fader, the administrator for the Division, (3) Ellen Anderson, the Director of the Center for Community Health, and (4) Dr. Perry Smith, the Director of the Division. (*Id.*, ¶ 96.) HRI Human Resources decided that Plaintiff should be counseled about her unprofessional behavior and required that Plaintiff submit an outside employment request to HRI for approval of her continued involvement with wildlife rehabilitation services. (*Id.*, ¶ 97.) Between August 5 and 6, 2010, Dr. Cherry drafted a counseling memo for Plaintiff and received comments on it from Ms. Hallenbeck and Ms. Fader. (*Id.*, ¶ 98.) On August 6, 2010, Plaintiff spoke about the fox incident with Ms. Fader and Dr. Anderson. (*Id.*, ¶ 99.) During that meeting, Plaintiff requested that she no longer be supervised by Dr. Cherry and Ms. Fader, and Dr. Anderson indicated that they would try to accommodate her request. (*Id.*)

Later that day, Ms. Fader and Dr. Cherry conducted a formal counseling session with Plaintiff regarding her behavior in the office on August 4, 2010. (*Id.*, ¶ 100.) Dr. Cherry explained to Plaintiff that her behavior was disrespectful and unprofessional. (*Id.*, ¶ 101.) He further explained that "your outside activities related to wildlife rehabilitation do not in any way give you authority or responsibility, as an HRI employee in this department, to become involved in matters with external entities regarding wildlife and potential rabies exposure." (*Id.*) Dr. Cherry and Ms. Fader explained to Plaintiff that the counseling session was not discipline, but was conducted for training purposes and was intended to prompt Plaintiff to change her

behavior.  (*Id.*, ¶ 103.)  Plaintiff was very upset and emotional during the meeting and reacted in a hostile manner toward Dr. Cherry and Ms. Fader.  (*Id.*, ¶ 101.)  Plaintiff believes that the fox incident as well as the subsequent counseling session occurred in retaliation for her request for a reprieve from non-hepatitis related duties.  (*Id.*, ¶ 109.)

Dr. Cherry and Ms. Fader did not provide Plaintiff with the counseling memo at the conclusion of their meeting because they wanted to amend it to reflect what was discussed in the meeting.  (*Id.*, ¶ 105.)  However, Dr. Cherry was unable to provide Plaintiff with a copy of the memo because she advised Dr. Cherry that her doctor had instructed her to stay home the following week.  (*Id.*, ¶ 106.)  HRI subsequently granted Plaintiff's request for intermittent FMLA leave in its entirety.  (*Id.*, ¶ 107.)  Plaintiff remained on FMLA leave until September 13, 2010.  (*Id.*, ¶ 108.)

<u>Plaintiff's Request for New Supervision</u>

Following Plaintiff's request for a new supervisor, it was decided that, upon Plaintiff's return from FMLA leave, Plaintiff would be supervised by Dr. Shelley Zansky in the Emerging Infections Program ("EIP").  (*Id.*, ¶ 110.)  Because Plaintiff also did not want to remain in the same office with Dr. Cherry, HRI decided to physically relocate Plaintiff's office from the Data Management Unit to the EIP where Dr. Zansky's office was located.  (*Id.*, ¶ 111.)  In addition, Dr. Kilby also granted Plaintiff's request to be taken off the EOD rotation.  (*Id.*, ¶ 112.)  Although all other epidemiological staff would continue to participate in the rotation, Plaintiff was consulted only when she was in the office and when the issue required involvement of someone with her expertise.  (*Id.*)  This new arrangement accommodated Plaintiff's desire to focus only on her grant deliverables as she previously requested.  (*Id.*, ¶ 113.)

-14-

<u>Plaintiff's Subsequent FMLA Leave</u>

Between January 1, 2011, and June 30, 2011, Plaintiff requested, and HRI granted her, intermittent FMLA leave. (*Id.*, ¶ 123.) Plaintiff's leave during this time period was between a few hours and two days at a time. (*Id.*) On June 30, 2011, Plaintiff began a continuous FMLA leave, which concluded on August 2, 2011. (*Id.*, ¶ 124.) Although Plaintiff remained out of work until August 20, 2011, the rest of Plaintiff's leave was not considered as FMLA leave because she had exceeded the 12-week statutory maximum. (*Id.*) Nevertheless, Plaintiff was permitted to take all the time that she needed until she was medically cleared to return to work. (*Id.*)

<u>Dr. Daniel Kuhles Becomes New BCDC Director</u>

In July 2011, Dr. Kuhles became the Director of BCDC. (*Id.*, ¶ 125.) Dr. Kuhles came to BCDC/DOH from a local health department, and thus had a unique perspective on how the Bureau should respond to the challenges that local health departments face in the field. (*Id.*, ¶ 126.) Dr. Kuhles sought to centralize the decision-making relative to the activities of the various programs within the Bureau. (*Id.*, ¶ 128.) To that end, he instructed all staff members, including Plaintiff, to consult with their direct supervisors and himself for any requests that would be made to entities outside of BCDC. (*Id.*)

In early September 2011, the CDC announced that hepatitis would no longer be part of the EIP competitive renewal and that hepatitis surveillance was being taken off of the EIP grant. (*Id.*, ¶ 129.) The CDC also announced that there would be a cooperative agreement that would provide hepatitis surveillance funding for the first 10 months of 2012 ("bridge funding"), at which time BCDC would have to apply for a new competitive grant. (*Id.*, ¶ 129.) Dr. Kuhles

had a particular interest in hepatitis surveillance and encouraged Plaintiff, who had typically written grant applications on her own without assistance from other BCDC staff, to work cooperatively as a member of a team to apply for the bridge funding. (*Id.*, ¶ 130.) Because Plaintiff was not used to having to go through supervisors to contact other entities, she had a difficult time adjusting to Dr. Kuhles' change of approach. (*Id.*, ¶ 132.) For example, Plaintiff repeatedly requested that the Director of the Statistical Unit in the Division of Epidemiology make certain changes to data surveillance systems to suit her needs without first consulting Dr. Kuhles or Dr. Deborah Blog. (*Id.*, ¶ 133.) Dr. Kuhles repeatedly advised Plaintiff that her requests to other Bureaus or to Divisions within DOH should be discussed internally before they were made. (*Id.*, ¶ 134.) Plaintiff, nonetheless, continued to prioritize her own needs without considering the overreaching needs of the Bureau. (*Id.*)

According to Dr. Kuhles, Plaintiff demonstrated a continuous pattern of acting outside of her purview and failing to appreciate and have insight into other department priorities and relationships. (*Id.*, ¶ 135.) Plaintiff also had significant difficultly working cooperatively with her colleagues at the BCDC, as Dr. Kuhles had requested. (*Id.*, ¶ 136.) For example, BCDC surveillance officers Ms. Knickerbocker, Ms. Kufel, and Ms. Mulhern complained that Plaintiff ruled with an iron fist and on several occasions instructed them not to answer hepatitis-related questions without consulting with her first, even if she was out of the office on leave or on vacation. (*Id.*, ¶ 137.) After several similar complaints were made, Dr. Kuhles brought the concerns of the BCDC staff to Dr. Blog, and they decided that it was no longer appropriate to have Plaintiff supervise staff within the Bureau and the regional offices. (*Id.*, ¶ 140.)

<u>Complaints Concerning Dr. Kuhles' Supervision</u>

On May 9, 2012, Plaintiff met with Dr. Blog to discuss her work with Dr. Kuhles and the significant re-structuring of the Bureau that was occurring under his supervision.  (*Id.*, ¶ 147.) Plaintiff complained that, because of the re-structuring implemented by Dr. Kuhles, "there was no one working on hepatitis surveillance that was paid on hepatitis surveillance and a lot of the day-to-day activities had ceased." (*Id.*, ¶ 148.)  Plaintiff also complained that the employees she had previously supervised had been reassigned.  (*Id.*)  Plaintiff further alleged that Dr. Kuhles had been "bullying" and "harassing" Plaintiff because he was demanding, and that he imposed strict deadlines, became agitated at times, made changes to the hepatitis program allegedly without informing Dr. Zansky or Dr. Blog, restructured the communications protocol for communications with outside Bureaus, Divisions, and local health departments, often changed his mind, and was rude in meetings.  (*Id.*, ¶ 149.)  However, Plaintiff did not at any time claim that Dr. Kuhles' actions were in retaliation for Plaintiff's FMLA leave or disability.  (*Id.*, ¶ 150.) Rather, Plaintiff attributed Dr. Kuhles' actions toward her as a result of her prior tensions with Dr. Cherry and Dr. Kilby, which Plaintiff stated began when she asked for a temporary reprieve from non-grant work.  (*Id.*, ¶ 151.)

Thereafter, on May 17, 2012, Plaintiff met with HRI Human Resources representatives to complain about Dr. Kuhles' supervision.  (*Id.*, ¶¶ 152-53.)  Plaintiff complained that Dr. Kuhles was harassing her and that his restructuring of the Bureau had changed her job duties, which she claimed violated the current hepatitis grant deliverables.  (*Id.*, ¶¶ 154-55.)  Ms. Bailey, who was one of the representatives with whom Plaintiff met, concluded that no illegal harassment had occurred and that Dr. Kuhles was merely a demanding supervisor.  (*Id.*, ¶ 154.)  Ms. Bailey and

Ms. Tamayo investigated Plaintiff's allegations of harassment further by meeting with Dr.

Zansky on May 25, 2012.  (*Id.*, ¶ 157.)  Dr. Zansky confirmed that Dr. Kuhles had not harassed

Plaintiff and was just a demanding supervisor for all of his employees.  (*Id.*)  In fact, many

employees, including Dr. Zansky, complained about Dr. Kuhles' management style to Dr. Blog.

(*Id.*, ¶ 160.)  Dr. Zansky informed Dr. Blog that, if Dr. Kuhles' unreasonable demands and

interference in EIP did not end, she would be forced to retire.  (*Id.*).  Similarly, Dr. Reena Reyes,

who worked as an epidemiologist in the Investigations Unit in BCDC, witnessed Dr. Kuhles

berating other BCDC employees in meetings that sometimes brought them to tears, harshly

criticized their work, and micromanaged their assignments.  (*Id.*, ¶¶ 162, 164.)  Dr. Reyes never

took FMLA leave and does not have a disability; however, Dr. Kuhles was similarly demanding

towards her. (*Id.*, ¶ 163.)  Dr. Reyes eventually left BCDC because she could no longer work for

Dr. Kuhles.  (*Id.*, ¶ 165.)

<u>May 2012 CDC Site Visit</u>

On or around March 20, 2012, a representative from CDC contacted Plaintiff regarding a

possible site visit by CDC to conduct a "lessons learned" review relating to hepatitis surveillance

and prevention in New York.  (*Id.*, ¶ 167.)  Plaintiff passed this information along to Dr. Zansky

and Dr. Kuhles.  (*Id.*)  Staff at BCDC viewed the site visit ahead of the expected funding

opportunity announcement ("FOA") as an opportunity to impress CDC with BCDC's

accomplishments during the prior funding periods and remain competitive for the new funding.

(*Id.*, ¶ 168.)  Following subsequent discussion with the CDC, the site visit was scheduled for

May 21-22, 2012, and an agenda was developed by mutual agreement between the CDC and

DOH.  (*Id.*, ¶ 169.)

Dr. Kuhles initially asked Plaintiff to give a presentation on Quality Improvement/Performance Management ("QI") during the CDC site visit. (*Id.*, ¶ 170.) However, Plaintiff did not feel comfortable presenting on QI because she felt that she did not know the topic very well. (*Id.*, ¶ 171.) On May 14, 2012, Plaintiff requested, through Dr. Zansky, that someone else be chosen to present on QI at the CDC site visit, and Dr. Kuhles accommodated her request. (*Id.*, ¶ 172.) Dr. Kuhles decided that Plaintiff should prepare a 30-45 minute presentation using the Strengths, Weaknesses, Opportunities, and Threats ("SWOT") analysis, on the future of hepatitis and public health, a topic on which Dr. Kuhles believed Plaintiff was particularly suited to present given her 10 years of experience in the field. (*Id.*, ¶ 173.)

Plaintiff's presentation was scheduled to occur on the afternoon of Tuesday, May 22, 2012. (*Id.*, ¶ 174.) However, due to delays in preparing the presentation, Dr. Zansky determined that Plaintiff's final draft was too "scattered" to present without substantial revisions. (*Id.*, ¶¶ 175-78.) Therefore, Plaintiff did not present at the CDC site visit because she was not able to complete the presentation in a form that would have reflected positively on the Bureau before the CDC. (*Id.*, ¶ 179.) Instead, Plaintiff joined the CDC site visit. (*Id.*)

June 2012 CSTE Conference in Nebraska

In March 2012, Plaintiff was invited to attend a conference of the Council of State and Territorial Epidemiologists ("CSTE") scheduled for June 3-7, 2012, in Omaha, Nebraska, during which there would be a special meeting to "summarize lessons learned from hepatitis surveillance activities in EIP, collection of specimens, and novel applications of surveillance data for targeting and evaluation prevention." (*Id.*, ¶ 180.) Although the special meeting was

related to Plaintiff's field of work, attending the conference was not one of the deliverables of the hepatitis surveillance grant. (*Id.*)

On or about March 23, 2012, Plaintiff sought permission to attend the CSTE conference. (*Id.*, ¶ 181.) Dr. Zansky and a number of other individuals working in EIP also submitted requests to attend the CSTE conference. (*Id.*, ¶ 182.) All of these requests were sent to Dr. Kuhles, who in turn forwarded them to Dr. Blog, who then forwarded them to her supervisors for a decision. (*Id.*) Initially, all of the requests were denied because Governor Cuomo had issued a "no travel" policy that prohibited unnecessary travel for state employees due to funding. (*Id.*, ¶ 183.) However, Dr. Zansky's request was ultimately approved because she was required to attend the conference as a supervisor of a CSTE graduate fellow pursuant to the fellowship requirements. (*Id.*, ¶ 184.) Dr. Blog and Dr. Cherry also attended the conference due to their respective positions as State Epidemiologist and State Veterinarian and their presence was required. (*Id.*) Plaintiff's request was initially denied; however, there is conflicting evidence regarding whether her request was subsequently approved. (*Id.*, ¶ 185.) Nonetheless, Plaintiff was required to attend a QI leadership training in Albany, New York, which was scheduled to take place during the latter part of the CSTE conference. (*Id.*, ¶ 185-86.) Accordingly, if Plaintiff was allowed to attend the CSTE conference, she would have had to leave in time to attend the QI leadership training. (*Id.*, ¶ 185.) It is undisputed that Plaintiff never attended the CSTE conference. (*Id.*, ¶ 186.)

<u>2012 CDC Hepatitis Grant and the End of Funding for Plaintiff's Position</u>

In June 2012, Plaintiff applied for and received permission to take intermittent FMLA leave starting on June 12, 2012. (*Id.*, ¶ 187.) While Plaintiff was out on FMLA leave, BCDC

received the FOA for the new CDC grant funding for hepatitis prevention and surveillance.  (*Id.*, ¶ 188.)  The FOA included a hepatitis prevention component, and had designed the enhanced hepatitis surveillance work on the new grant to serve its prevention efforts.  (*Id.*, ¶ 189.)  The FOA also indicated that the CDC intended to award only 5 to 10 grants for hepatitis surveillance nationwide.  (*Id.*)

BCDC had a shortened period of time to apply for the new available funding and had to compete for the grants not only nationwide but also with the New York City Department of Health and Mental Hygiene.  (*Id.*, ¶¶ 190, 192.)  The hepatitis grant-related decisions were made by a committee that included DOH Deputy Commissioner Gus Birkhead, CHC Director Brad Hutton, Division Director Dr. Blog, and Dr. Kuhles.  (*Id.*, ¶ 191.)  The committee fully intended to include Plaintiff in the DOH's response to the FOA when on July 20, 2012, during Plaintiff's FMLA leave, Plaintiff's counsel advised HRI that Plaintiff considered herself constructively discharged.  (*Id.*, ¶ 196.)  Accordingly, Plaintiff declared that she did not intend to work at BCDC and removed herself from the workforce.  (*Id.*, ¶ 198.)

As the CDC grant application deadline neared, the committee had to make a decision as to what to do with the funds that had been planned on being budgeted to continue to support Plaintiff on the new grant.  (*Id.*, ¶ 199.)  However, because the committee was advised that Plaintiff would not be returning to BCDC, the committee decided to budget for a Programmer/Analyst position in order to better demonstrate BCDC's ability to enhance electronic reporting of viral hepatitis data.  (*Id.*)  Due to the reduced CDC funding and the new design of the hepatitis surveillance program, other employees lost funding for their positions in hepatitis surveillance.  (*Id.*, ¶ 201.)

On August 10, 2012, HRI responded to Plaintiff, through counsel, that it was still willing to allow Plaintiff to return to work if and when she was able to do so at the end of her FMLA leave. (*Id.*, ¶ 203.) HRI gave Plaintiff until August 28, 2012, to notify it of her decision and, if it did not receive a response, it would treat her prior correspondence as a notice of resignation. (*Id.*) Plaintiff received HRI's letter but did not respond. (*Id.*, ¶ 204.) Nonetheless, because HRI received a notice from the Hartford that Plaintiff's disability payments were being extended through November 1, 2012, HRI kept Plaintiff on its payroll to ensure she had access to health insurance while she was out on FMLA leave. (*Id.*, ¶ 205.)

Pursuant to HRI's collective bargaining agreement with CSEA, Plaintiff, as well as other employees, received rescindable layoff letters dated October 12, 2012, indicating that the prior hepatitis grant funding would end on October 31, 2012, and that their employment would be terminated at that time due to a lack of funding. (*Id.*, ¶ 206.) HRI kept Plaintiff on the payroll until October 31, 2012. (*Id.*, ¶ 211.)

## II.    APPLICABLE LEGAL STANDARDS

### A.    Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme

Court has famously explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movign party. *Anderson*, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

Finally, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**B.      Standard Governing a Motion to Strike Evidence**

Pursuant to Fed. R. Civ. P. 37(c), "[i]f a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).  "In enforcing these rules, the court may impose sanctions, which where appropriate, include precluding the testimony."  *See LaVigna v. State Farm Mut. Auto Ins. Co.*, 736 F. Supp. 2d 504, 510-11 (N.D.N.Y. 2010) (Sharpe, J.) (citing *Patterson v. Balsamico*, 440 F.3d 104, 117 [2d Cir. 2006]).

When considering whether to exclude evidence pursuant to Rule 37, this court must consider (1) the non-disclosing party's explanation for the failure to comply with the Federal Rules, (2) the importance of the evidence, (3) the prejudice suffered by the opposing party of having to prepare to meet the new evidence, and (4) the possibility of a continuance.  *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).  Although a finding of the non-

disclosing party's bad faith is not required in order to impose sanctions under Rule 37, it is a

factor that may be considered as part of the non-disclosing party's explanation for its failure to

comply. *See Design Strategy, Inc.*, 469 F.3d at 296.

## III. ANALYSIS

### A. Whether the Affidavits Filed in Support of Defendant's Motion Should Be Struck[6]

Plaintiff argues that the four *Design Strategy* factors weigh in favor of precluding the six

affidavits and three exhibits at issue. (Dkt. No. 59, at 3-6 [Pl.'s Mem. of Law].) First, Plaintiff

argues that the failure to disclose these six affiants was not inadvertent because they are high-

ranking employees of either HRI or DOH with information relevant to this case. (*Id.* at 4.)

Furthermore, Plaintiff argues that HRI's initial disclosure identified only two individuals (other

than Plaintiff) who had information HRI would use to support its defenses: Carol Bailey and

Daniel Kuhles. (*Id.*)

Second, Plaintiff argues that Defendant has placed great importance on this evidence by

relying heavily on it throughout its summary judgment motion. (*Id.* 4-5.)

Third, Plaintiff argues that she would be prejudiced if these individuals are not excluded

as witnesses. (*Id.* at 5-6.) Plaintiff concedes that, while she was able to depose Dr. Cherry and

Dr. Zansky, the other four individuals were not deposed. (*Id.* at 5.) Notwithstanding these

depositions, Plaintiff argues that, had she been given notice that these two individuals were

potential witnesses, she could have sought additional discovery, such as information about their

employment, could have had the opportunity to question them about their affidavits during

depositions. (*Id.*)

---

[6] The Court begins its analysis by considering Plaintiff's cross-motion due to Defendant's
heavy reliance upon the affidavits and exhibits at issue in support of its summary judgment motion.

Fourth, and finally, Plaintiff argues that a continuance to re-open discovery to cure these issues is not a viable option due to her limited financial resources, the time and effort it has already taken to reach this point in litigation, and the likelihood of having to re-brief her response to Defendant's motion for summary judgment after additional discovery is completed. (*Id.* at 5-6.)

In opposition, Defendant makes five arguments. First, Defendant argues that Plaintiff identified Dr. Cherry and Dr. Zansky in her initial disclosures and stated that she believed they would have information relevant to the circumstances of her employment. (Dkt. No. 63, at 21 [Def.'s Opp'n Mem. of Law].) Furthermore, Defendant argues that Plaintiff was the one who scheduled and conducted depositions of both of these witnesses. (*Id.*)

Second, with respect to Dr. Blog and Dr. Kilby, Defendant argues that Plaintiff was the one who identified them in her initial disclosures and responses to HRI's interrogatories. (*Id.* at 22.) Defendant also notes that Plaintiff testified at length about both of these witnesses during her deposition, and that they were discussed during Plaintiff's depositions of Dr. Cherry, Dr. Kuhles, and Dr. Zansky. (*Id.*) Furthermore, Defendant argues that it has produced numerous e-mails that were sent and received by Dr. Kilby, which Plaintiff has relied upon heavily in her opposition to Defendant's summary judgment motion. (*Id.*) In sum, Defendant argues that Plaintiff was fully aware of the significance of Dr. Kilby's and Dr. Blog's roles and knowledge pertaining to the claims in this case and cannot now reasonably complain that she chose not to depose them. (*Id.*)

Third, with respect to Ms. Reyes, Defendant argues that it produced 62 documents during discovery that referenced her. (*Id.* at 23.) In particular, Defendant argues that at least nine of

these documents involved Ms. Reyes's interactions with Plaintiff and Dr. Kuhles where Dr. Kuhles allegedly responded to Plaintiff and Ms. Reyes in a brusque manner. (*Id.*) Defendant further notes that Plaintiff worked in the same bureau as Ms. Reyes and attended the same weekly meetings conducted by Dr. Kuhles. (*Id.*) Accordingly, Defendant argues that Plaintiff was clearly on notice of Ms. Reyes's potential testimony and could have sought to depose her prior to the close of discovery. (*Id.*) Finally, Defendant argues that Ms. Reyes's testimony is critical in showing that Dr. Kuhles's difficult management style affected non-disabled employees and employees who did not take FMLA leave in the same way as Plaintiff. (*Id.*)

Fourth, in regard to Mr. Saglimbeni's affidavit, Defendant argues that it merely recites publically available background information, which the Court may take judicial notice of and does not prejudice Plaintiff. (*Id.* at 24.)

After carefully considering the matter, the Court agrees with Defendant for the reasons stated in its opposition memorandum of law. (Dkt. No. 63, at 20-25 [Def.'s Opp'n Mem. of Law].) To those reasons, the Court adds only that, while the Court does not condone a parties' failure to comply with its obligations under Fed. R. Civ. P. 26(a)(e), the undisputed facts reveal that these individuals, with the exception of Mr. Saglimbeni, either supervised Plaintiff or interacted with her regularly during her employment. Therefore, Plaintiff was well aware of their identities and the scope of their knowledge as it pertains to this lawsuit. *See Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 177 (S.D.N.Y. 2013) (holding that former employee's failure to disclose supervisors as potential witnesses did not warrant preclusion of supervisors' affirmations on motion for summary judgment where employee was aware of supervisors' identities and scope of their knowledge); *LaVigna*, 736 F. Supp. 2d at 511 (denying motion to

strike where affiant supervised plaintiff during period leading up to termination, plaintiff had

awareness of affiant's role and involvement of events at issue, and several documents

mentioning affiant were turned over); *Lore v. City of Syracuse*, 00-CV-1833, 2005 WL 3095506,

at *2 (N.D.N.Y. Nov. 17, 2005) (Munson, J.) (holding that, "[w]hile it may be true that plaintiff

failed to adhere to the letter of the discovery rules, the court is convinced that defendants were

sufficiently aware of the existence and relevance of the persons in question so that defendants

are not being subject to trial by ambush"); *Morgenstern v. Cty. of Nassau*, 04-CV-0058, 2008

WL 4449335, at *2 (E.D.N.Y. Sept. 29, 2008) (finding harmless error where plaintiff was aware

of affiant's role in lawsuit, testified about affiant's role in deposition, and served document

request on defendant seeking documents from affiant); *Fleet Capital Corp. v. Yamaha Motor

Corp., U.S.A.*, 01-CV-1047, 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) ("[A] failure to

disclose witness information is harmless if the other party was well aware of the identity of the

undisclosed witness and the scope of their knowledge well before trial.") (internal quotation

marks omitted); *cf. Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011)

(refusing to strike affidavits because non-disclosed affiants were mentioned at depositions),

*vacated in part on other grounds sub nom. Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d

Cir. 2013).

Accordingly, Plaintiff's cross-motion is denied.

**B.      Whether Plaintiff's Constructive Discharge Claim Should Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative

for the reasons set forth in Defendant's memorandum of law and reply memorandum of law.

(Dkt. No. 40, at 8-14 [Def.'s Mem. of Law]; Dkt. No. 63, at 6-7 [Def.'s Reply Mem. of Law].)

To those reasons, the Court adds that Defendant went to great lengths in its memorandum of law to argue that Plaintiff's constructive discharge claim should be dismissed. (Dkt. No. 40, at 8-14 [Def.'s Mem. of Law].) Plaintiff's opposition memorandum of law is conspicuously devoid of a response to these arguments. It is well established that a court may infer that a plaintiff has abandoned a claim where the plaintiff has failed to defend against a challenge to that claim. *Jackson v. Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014); *see also Petrisch v. HSBC Bank USA, Inc.*, 07-CV-3303, 2013 WL 1316712, at *17 (E.D.N.Y. Mar. 28, 2013) (holding that the plaintiff abandoned her NYCHRL claim because she "conspicuously le[ft] out the NYCHRL"); *Plahutnik v. Daikin Am., Inc.*, 10-CV-1071, 2012 WL 6108236, at *5 (S.D.N.Y. Dec. 6, 2012) ("Arguments not made in opposition to a motion for summary judgment are deemed abandoned."); *Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 280 (S.D.N.Y. 2011) (holding that the plaintiff abandoned six claims when her brief failed to respond to the defendants' arguments on those claims).

Furthermore, as stated above in Point II.A. of the Decision and Order, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. N.D.N.Y. L.R. 7.1(b)(3). Here, the Court has carefully reviewed Defendant's arguments in support of its motion to dismiss Plaintiff's constructive discharge claim and finds that they possess facial merit such that Defendant has met its modest burden in favor of dismissal. For all these reasons, Plaintiff's constructive discharge claim is dismissed.

**C.    Whether Plaintiff's FMLA, ADA, and NYSHRL Retaliation Claims Should Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth below.

Retaliation claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Croons v. New York State Office of Mental Health*, 18 F. Supp. 3d 193, 207 (N.D.N.Y. 2014) (Hurd, J.); *accord*, *Knox v. Town of Southeast*, 599 F. App'x 411, 413-14 (2d Cir. 2015). Accordingly, to establish a prima facie case of retaliation under the FMLA, ADA, and NYSHRL, a plaintiff must show the following: "(1) participation in a protected activity known to the defendant; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action."[7] *Housel v. Rochester Inst. of Tech.*, 6 F. Supp. 3d 294, 303 (W.D.N.Y. 2014); *accord*, *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004).

"Thereafter, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Housel*, 6 F. Supp. 3d at 303 (citing *Holt v. KMI–Cont'l, Inc.*, 95 F.3d 123, 129 [2d Cir. 1996]). "If the defendant satisfies this burden, the plaintiff must present evidence that the articulated reason was a pretext for discrimination." *Id.*

---

[7]    Courts have also held that, in order to make out a prima facie case under the FMLA, a plaintiff must establish that "[1] he exercised rights protected under the FMLA; [2] he was qualified for his position; [3] he suffered an adverse employment action; and [4] the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). With regard to a prima facie case under the ADA and NYSHRL, courts have held that a plaintiff must establish that "[1] the employee was engaged in an activity protected by the ADA, [2] the employer was aware of that activity, [3] an employment action adverse to the plaintiff occurred, and [4] there existed a causal connection between the protected activity and the adverse employment action." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999); *see also White v. Pacifica Found.*, 973 F. Supp. 2d 363, 384 (S.D.N.Y. 2013) (applying these elements to a NYSHRL claim).

"Specifically, a plaintiff must show that, 'but-for' the protected activity, he or she would not have suffered the adverse employment action." *Id.* (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 [2013]).

In the present case, it is undisputed that Plaintiff engaged in protected activity that was known to HRI when she applied for FMLA leave. As noted above, however, Defendant argues that Plaintiff cannot establish that she suffered an adverse employment action or that any of the alleged adverse employment actions occurred under circumstances giving rise to an inference of retaliatory intent. (Dkt. No. 40, at 8-18 [Def.'s Mem. of Law].) The Supreme Court has defined "adverse employment action" as one that a reasonable employee would find "materially adverse," meaning that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Furthermore, "[m]aterial adversity is to be determined objectively, based on the reactions of a reasonable employee." *Tepperwein v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (citing *White*, 548 U.S. at 69-70); *see also Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 440 (E.D.N.Y. 2015) (noting that "[t]he applicable test in the retaliation context is that a 'plaintiff must show that a reasonable employee would have found the challenged action materially adverse"). "'Context matters,' as some actions may take on more or less significance depending on the context." *Tepperwein*, 663 F.3d at 568. However, "petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor can a plaintiff's "'subjective feelings' concerning an employment action . . . establish that the action was materially adverse." *Guzman v. City of New York*, 93 F. Supp. 3d 248, 257 (S.D.N.Y. 2015) (citing *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75, 87 [E.D.N.Y. 2002]).

In opposition to Defendant's motion, Plaintiff argues that, when she returned from her first FMLA leave, she was suddenly "barred" from attending unit manager meetings. (Dkt. No. 60, at 11-12 [Pl.'s Opp'n Mem. of Law].)  In addition, Plaintiff argues that, after returning from her second FMLA leave, she was precluded from planning and participating in the May 2012 CDC site visit, even though she was the viral hepatitis surveillance coordinator, her position was 100% funded by the CDC, and the assignments she was given by Dr. Kuhles during the site visit were not consistent with this funding.  (*Id.*, at 13.)  Finally, Plaintiff argues that she was not allowed to attend the CSTE conference in Omaha, Nebraska, despite being the coordinator of the hepatitis surveillance program and being allowed to attend these conferences for many years prior to taking FMLA leave.  (*Id.*, at 13-14.)

With respect to Plaintiff's argument regarding the unit manager meetings, the Court is unpersuaded that her exclusion from the meeting constitutes an adverse employment action. More specifically, the undisputed facts reveal that, after returning from FMLA leave, Plaintiff requested a transfer from the Data Management Unit and Dr. Cherry's supervision.  As a result of being placed in the EIP,[8] Plaintiff was no longer a unit manager in the Data Management Unit and no longer required to attend the unit manager meetings that she previously attended.  (Dkt. No. 41, ¶ 99 [Cherry Aff.]; Dkt. No. 46, ¶¶ 92-99 [Kilby Aff.].)  Although Dr. Zansky had requested Plaintiff to attend one of the meetings on her behalf, Dr. Kilby e-mailed Plaintiff ahead of time to advise that her presence was not required.  (Dkt. No. 46, Attach. 10.)  Plaintiff did not read the e-mail and attended the meeting as requested by Dr. Zansky but was informed by Dr.

---

[8]      Plaintiff does not argue, nor is there evidence to suggest, that Plaintiff's transfer constituted a materially adverse employment action.  *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) (holding that "a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," equating to demotion).

Kilby that she did not need to be there.  (*Id.*)  Notwithstanding this one-time arrangement, it is clear that Plaintiff was no longer required to participate in the meetings by virtue of her request to be transferred to a different position.  Accordingly, Plaintiff cannot complain about this change when she was the one who requested it.  *See Tepperwein*, 663 F.3d at 571 (noting that "the switch to the night shift was not materially adverse because, as his own testimony makes clear, [plaintiff] requested it"); *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 399 (S.D.N.Y. 2011) (holding that "Plaintiff's allegation that he was excluded from management meetings, when considered in context, does not constitute an adverse employment action"); *Hepburn v. City of Torrington*, 02-CV-1252, 2004 WL 1771590, at *5 (D.Conn. Aug. 4, 2004) (holding that the exclusion of the plaintiff, who was not a captain or lieutenant, from a captains' meeting was not an adverse employment action); *Watson v. Paulson*, 578 F. Supp. 2d 554, 565 (S.D.N.Y. 2008) (holding that excluding secretary from a staff meeting did not impact the performance of her duties or result in a material change in the terms and conditions of her employment); *cf. Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006) (concluding at the summary judgment stage that the plaintiff's exclusion from managerial meetings constituted an adverse employment action where plaintiff had demonstrated that such exclusion indicated a significant change in his responsibilities).

Similarly, with respect to Plaintiff's argument regarding the CDC site visit, that argument is equally unpersuasive when viewed in light of the undisputed facts.  The Court reaches this conclusion for two reasons.  First, Plaintiff's argument that she was not involved in the planning of the visit is controverted by an e-mail sent to her by Dr. Kuhles, which specifically requested Plaintiff to "develop a plan with [her] recommendations on how to respond to the proposed

agenda" for the CDC visit. (Dkt. No. 64, Attach. 1 [Ex. "A" HRI-0000898].) Dr. Kuhles also requested that Plaintiff provide him with a "copy of the results/conclusions from the last site visit that was conducted." (*Id.*, at Ex. "A" HRI-0000434-HRI-0000441.) In response, Plaintiff prepared a one-page proposed agenda for the site visit in response to the CDC's specifications, and provided it to Dr. Kuhles and Dr. Zansky. (*Id.*, at Ex. "A" HRI-0007318.) Accordingly, Plaintiff was clearly involved with the planning of the site visit.

Second, as discussed above in Point I.B. of this Decision and Order, Dr. Kuhles asked Plaintiff to prepare and give a presentation during the site visit on the hepatitis quality improvement initiative. Plaintiff expressed concerns to Dr. Zansky about her experience with the initiative and indicated that she was not comfortable presenting on this topic. When this fact was brought to Dr. Kuhles' attention, he agreed with Plaintiff and decided that she should develop a presentation utilizing the SWOT framework for the future of hepatitis and public health instead. (Dkt. No. 45, Attach. 8 [Ex. "H" HRI-0000940].) It is apparent from the record that Plaintiff was not happy with this topic either. (*Id.* [Ex. "H" HRI-0005154].) However, the Court does not find that giving Plaintiff this assignment, after she had requested a new one, amounts to adverse action.

Furthermore, the undisputed facts do not suggest that Plaintiff was excluded from participating in the site visit. In addition to being asked to make a presentation to the CDC, Dr. Kuhles emphasized prior to the visit that, "[l]ike others on the team, [Plaintiff] should be present throughout the site visit." (Dkt. No. 45, Attach. 8 [Ex. "H" HRI-0000940].) Despite being given a little more than a week to work on the presentation, Plaintiff waited until "Sunday evening around 8pm, through 2am" to try and complete the assignment. (*Id.* [Ex. "H" HRI-0005154].)

The following day, which was the first day of the CDC site visit, Plaintiff missed the introduction portion of the visit to participate in a previously scheduled training for the QI project. (*Id.* [Ex. "H" HRI-0007439, HRI-0008753].) Thereafter, Plaintiff took time to try and complete her presentation before joining the site visit at 1 pm. (*Id.* [Ex. "H" HRI-0005154].) However, Plaintiff was forced to leave the visit at 3 pm due to a family emergency. (*Id.*) As discussed previously, it was ultimately determined by Dr. Zansky that Plaintiff's presentation was not satisfactory and she did not end up presenting. Instead of presenting, Plaintiff attended other portions of the site visit after Dr. Zansky encouraged her to come. (*Id.* [Ex. "H" HRI-0005155].)

Based upon these facts, it is evident that the only portion of the site visit that Plaintiff missed as a result of any action attributable to HRI was due to the QI training, which required her to miss only the introductions that were scheduled on the first day. Plaintiff has failed to demonstrate how this was retaliatory or disadvantaged her in any way.

Finally, with respect to Plaintiff's argument regarding the CSTE conference, at first glance there appears to be conflicting evidence as to whether Plaintiff was ultimately given permission to attend. Despite her request (along with requests submitted by several other employees) being initially denied, Dr. Kuhles and Dr. Zansky stated that travel authorization was later procured and Plaintiff was informed that she could attend the conference. (Dkt. No. 49, ¶¶ 62-65 [Kuhles Aff.]; Dkt. No. 48, ¶ 92 [Zansky Aff.].) The one caveat was that Plaintiff return to New York in time to attend a QI training beginning on June 5, 2012, which was during the latter part of the CSTE conference. (*Id.*) Despite testifying at her deposition to the contrary (Dkt. No. 45, Attach. 7, at 138:9-14 [Rizzo Dep.]), Plaintiff's personal notes, dated May 8, 2012,

appear to corroborate that she was allowed to attend the conference.  (Dkt. No. 45, Attach. 9 [Ex. "I" HRI-P02870].)  Specifically, with reference to the CSTE conference, Plaintiff's notes state that "[s]uddenly a QI Leadership that week.  *I can go* [to the conference]*, but be back Tues*[9] *AM.*" (*Id.*) (emphasis added).

The Supreme Court has instructed that, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *accord*, *Vega v. Rell*, 611 F. App'x 22, 25-26 (2d Cir. 2015); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (holding that summary judgment properly granted to defendants where plaintiff "relies almost entirely on her own testimony," which was contradicted by "contemporaneous letters and meeting notes"); *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (explaining that district court could resolve issues of credibility on motion for summary judgment in narrow circumstances where [1] the testimony of non-movant is largely unsubstantiated by any other direct evidence, and [2] that testimony is so incomplete and/or replete with inconsistencies and improbabilities that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant).  The affidavits filed by Dr. Kuhles and Dr. Zansky, coupled with Plaintiff's contemporaneous notes, establish that Plaintiff was aware that she had received permission to go to the conference. Therefore, there is no admissible record evidence of retaliation regarding the CSTE conference.

_____

[9]     The Court takes judicial notice of the fact that June 5, 2012, was a Tuesday.

Nor does the temporal proximity of the events regarding Plaintiff's FMLA leave support her argument that she was retaliated against. It is well established that "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).[10] Plaintiff returned from her first FMLA leave on September 13, 2010. The unit manager meeting that Plaintiff alleges she was excluded from occurred on November 18, 2010. "[D]istrict courts in this Circuit have consistently held that a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." *Ruhling v. Tribune Co.*, 04-CV-2430, 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007); *see also Hussein v. Hotel Emps. & Rest. Union, Local 6*, 108 F. Supp. 2d 360, 367 (S.D.N.Y. 2000) (holding that "the passage of more than two months defeats any retaliatory motive"); *Doner-Hedrick v. N.Y. Inst. of Tech.*, 874 F. Supp. 2d 227, 246 (S.D.N.Y. 2012) (noting that, "[i]n general, periods greater than two months defeat an inference of causation"). Here, the delay was more than two months.

Similarly, Plaintiff returned from her second FMLA leave on August 16, 2011. The May 2012 CDC site visit occurred approximately nine months later, and the CSTE conference held in June, 2012, occurred approximately ten months later. Accordingly, temporal proximity does not support retaliatory intent with respect to these events.

---

[10] The Court notes that, temporal proximity, in and of itself, is insufficient to prove pretext. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (holding that "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage"); *El Sayed*, 627 F.3d at 933 (holding that, without more, "temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext"). However, for purposes of thoroughness, the Court will consider this issue.

Finally, even if Plaintiff were able to set forth a prima facie case of retaliation, HRI has presented a legitimate, nondiscriminatory reason for Plaintiff's dismissal from employment. Specifically, the end of grant funding for a particular program or position and corporate restructuring are legitimate, nondiscriminatory reasons for eliminating a previously funded position. *See Tarshis v. The Riese Org.*, 211 F.3d 30, 37 (2d Cir. 2000) (stating that "restructuring that results in an elimination of jobs often is a legitimate reason for dismissing an employee"); *Garcia v. Henry St. Settlement*, 501 F. Supp. 2d 531, 540 (S.D.N.Y. 2007) (holding that "the non-renewal of the grant that funded [plaintiff's] department" was a legitimate, nondiscriminatory explanation); *Spence v. Fayette Cty.*, 07-CV-1711, 2009 WL 961118, at *4 (W.D. Pa. Apr. 8, 2009) (employer's loss of grant funding was a legitimate, nondiscriminatory reason for terminating employee).

For all of these reasons, Plaintiff's retaliation claims are dismissed.

### D. Whether Plaintiff's FMLA Interference Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth below.

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "An employee may bring an interference claim against the employer when 'the employer in some manner impeded the employee's exercise of [the] right[s] afforded substantive protection under the FMLA.'" *Bowman v. CSX Transp., Inc.*, 22 F. Supp. 3d 181, 188 (N.D.N.Y. 2014) (Sharpe, C.J.) (quoting *Nichik v. N.Y.C. Auth.*, 10-CV-5260, 2013 WL 142372, at *12-13 [E.D.N.Y. Jan. 11, 2013]). "To state a prima facie claim for interference

under the FMLA, [plaintiff] must allege: (1) he is an eligible employee; (2) [plaintiff's employer] qualifies as an employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he gave notice to the defendant of his intention to take leave; and (5) [plaintiff's employer] denied him benefits to which he was entitled under the FMLA." *Bowman*, 22 F. Supp. 3d at 188-89.

Plaintiff argues that her request for FMLA leave was frustrated when, after giving Dr. Cherry an acknowledgment form that she would be requesting FMLA leave, Dr. Cherry engaged in a series of e-mail conversations with Dr. Kilby and a representative in the human resources office in an attempt to "limit, curtail, and interfere with" Plaintiff's request. (Dkt. No. 60, at 6-8 [Pl.'s Opp'n Mem. of Law].) In addition, Plaintiff argues that, two days after she requested FMLA leave, Dr. Cherry retaliated against her by subjecting her to a counseling session regarding her "unprofessional behavior." (*Id.* at 8-9.) Plaintiff also notes that she received the counseling memorandum that summarized the session the day she returned from her first FMLA leave, presumably to upset her. (*Id.* at 10.)

The Court is unpersuaded by Plaintiff's arguments because she has admitted that (1) the only accommodation that she requested was FMLA leave, and (2) that HRI granted every request she made. (Dkt. No. 57, ¶¶ 33, 36 [Pl.'s Rule 7.1 Response].) Therefore, Plaintiff cannot establish the fifth element of her claim: that HRI denied her benefits to which she was entitled under the FMLA. Accordingly, conversations that Dr. Cherry may have had with the human resources department or Dr. Kilby (his supervisor) regarding Plaintiff's request are of no moment.

Furthermore, the undisputed evidence demonstrates that the counseling session to which Plaintiff was subjected was not in any way related to Plaintiff's FMLA leave, but was conducted to address Plaintiff's verbal altercation with her supervisor regarding the fox incident. Indeed, Plaintiff has admitted that she attributed the counseling session to "her request for a reprieve from non-hepatitis-related duties," not her FMLA leave. (Dkt. No. 57, ¶ 109 [Pl.'s Rule 7.1 Response].) Finally, it is well settled in this Circuit that counseling is not considered a form of discipline and, as a result, does not amount to an adverse employment action. *Tepperwien*, 663 F.3d at 570 (holding that, "in the context of the issuance of a 'counseling memo,' that 'criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action'") (quoting *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 [2d Cir. 2001]). Plaintiff has also admitted that CSEA, Plaintiff's union, does not include counseling as a form of discipline. (Dkt. No. 57, ¶ 104 [Pl.'s Rule 7.1 Response].) Nor does HRI view counseling as a form of discipline. (*See* Dkt. No. 42, Attach. 6 [e-mail from human resources to Plaintiff explaining that "counseling is intended to be a constructive device aimed at modifying behavior. It is instructional and not punitive. Counseling is not discipline."].)

Therefore, Plaintiff's subjective feelings that HRI attempted to interfere with her FMLA leave is insufficient to raise a triable issue of fact with respect to her FMLA interference claim. *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 208 (S.D.N.Y. 2009) (holding that plaintiff's "unsupported 'feeling' that defendants terminated him in retaliation for filing FMLA leave because that was interfering with his work or because 'they were annoyed becuase they perceived that [his] FMLA leave inconvenienced them'" was insufficient to raise an issue of

triable fact); *McCaskill v. ShopRite Supermarket* 13-CV-0238, 2015 WL 419658, at *8

(N.D.N.Y. Jan. 30, 2015) (Sannes, J.) (holding that "plaintiff has demonstrated nothing more

than his own subjective belief and feeling that he was discriminated against, which is not enough

to make out a prima facie discrimination case") (internal quotations omitted).  For all of these

reasons, Plaintiff's FMLA interference claim is dismissed.

### E.    Whether Plaintiff's ADA and NYSHRL[11] Disability Discrimination Claims Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative

for the reasons set forth below.

Plaintiff argues that HRI failed to provide her with a reasonable accommodation for her

disability as required by the ADA.  (Dkt. No. 60, at 4-5 [Pl.'s Opp'n Mem. of Law].)  "A

plaintiff suing under the ADA for disability discrimination bears the burden of establishing a

prima facie case."  *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183-84 (2d Cir. 2006).  "A

plaintiff makes out a prima facie case of disability discrimination arising from a failure to

accommodate by showing each of the following: '(1) [P]laintiff is a person with a disability

under the meaning of the ADA; (2) an employer covered by the statute had notice of his

disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of

the job at issue; and (4) the employer has refused to make such accommodations.'"  *McBride v.*

*BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96-97 (2d Cir. 2009) (quoting *Graves*, 457

F.3d at 184).  As discussed in the preceding section, Plaintiff has admitted that the only

---

[11]        "A claim of disability discrimination under the NYSHRL is governed by the same legal standards as govern federal ADA claims." *Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 292 (E.D.N.Y. 2013).  "Thus, to the extent that [a plaintiff] brings a state-law disability-discrimination claim, it survives or fails on the same basis as [plaintiff's] ADA claim." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).

accommodation that she requested was FMLA leave and that HRI granted every request she made.  Accordingly, Plaintiff cannot establish the fourth element of this claim, and any claim based upon a failure to accommodate is therefore dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 38) is

**<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's cross-motion to strike (Dkt. No. 58) is **<u>DENIED</u>**.

 The Clerk of the Court is directed to enter judgment in favor of the Defendant and close this case.

Dated: February 16, 2016
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief, U.S. District Judge